595 F.2d 897
 ITT WORLD COMMUNICATIONS, INC. and RCA Global
Communications, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
and
Graphnet Systems, Inc., Telenet Communications Corporation,
TRT Telecommunications Corporation, and Western
Union International, Inc., Intervenors.
 Nos. 48, 61, Dockets 77-4028, 78-4047.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 1, 1978.
Decided March 22, 1979.
 
 H. Richard Schumacher, New York City (Cahill Gordon & Reindel, New York City, John A. Shutkin, Sandra S. Baron, Francis J. DeRosa and Charles M. Lehrhaupt, New York City, of counsel), for petitioner, RCA Global Communications, Inc.
 Gregory M. Christopher, Washington, D. C. (F.C.C., Washington, D. C., Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel and John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson, Daniel J. Conway, Dept. of Justice, Washington, D. C., of counsel), for respondents, Federal Communications Commission and United States of America.
 E. Edward Bruce, Washington, D. C. (Covington & Burling, Washington, D. C. and Roderick A. Mette, Vice President and Counsel, TRT Telecommunications Corp., Washington, D. C., of counsel), for intervenor, TRT Telecommunications Corporation.
 Donald E. Ward, Washington, D. C. (Philip M. Walker, Vice President and Gen. Counsel, Telenet Communications Corp., Vienna, Va., of counsel), for intervenor, Telenet Communications Corporation.
 Before MOORE, FRIENDLY and GURFEIN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 ITT World Communications, Inc. (ITT) and RCA Global Communications, Inc. (RCA), both international record carriers[1] (IRC's), joined by intervenor TRT Telecommunications Corp., also an IRC, ask us to review an order of the Federal Communications Commission (FCC or the Commission), released January 11, 1977, 63 F.C.C.2d 402 (1977), insofar as it granted applications of intervenors Graphnet Systems, Inc. (Graphnet) and Telenet Communications Corp. (Telenet) under § 214 of the Federal Communications Act (the Act), 47 U.S.C. § 214, for certificates to engage in specialized international record communications service. More specifically, Graphnet's application was to lease facilities from Communications Satellite Corporation (Comsat) and connecting facilities in the United States to permit its subscribers to use its facsimile services to communicate with terminal devices in Belgium, Denmark, France, Italy, the Netherlands, Norway, Spain, Sweden, Switzerland, the United Kingdom and West Germany,[2] and Telenet's application was to obtain Comsat circuits and lease appropriate connecting facilities in the United States to extend its public packet-switched data communications service from the continental United States to the United Kingdom and points beyond.[3] In the same proceeding, the FCC granted an application of RCA "for authority to provide an enhanced class of Overseas Datel Service (Datel II) to be offered initially on an experimental basis for a one-year period between the United States and The Netherlands using its previously authorized overseas communications facilities" and an application of Western Union International, Inc. (WUI), also an IRC, "for authority to use its previously authorized overseas communications facilities to provide Database service on an experimental basis for a one-year period between the United States and the United Kingdom." 63 F.C.C.2d at 403. Pursuant to the Commission's regulations, 47 C.F.R. § 63.52(c), ITT and RCA had filed timely petitions to deny Graphnet's and Telenet's applications.
 
 
 2
 On February 11, 1977, RCA petitioned for reconsideration of the FCC's decision insofar as it granted the applications of Graphnet and Telenet. Having meanwhile denied RCA's request for a stay, the Commission denied the petition in an extensive opinion released April 3, 1978, Graphnet Systems, Inc., 67 F.C.C.2d 1020 (1978).[4] ITT and RCA have petitioned for review by this court, and TRT has intervened in support of their petition. WUI, which had opposed the application before the FCC and intervened in this action, filed no brief and made no argument. Graphnet and Telenet likewise intervened but only Telenet filed a brief and argued.
 
 I.
 
 3
 Before discussing the legal issues, it will be well to recount in summary form the structure of the United States system of "record carriers" as it was before the decision here under review. The Western Union Telegraph Co. (WU) was, until very recently, the sole domestic carrier of telegrams.[5] However, following upon the decision in Specialized Common Carrier Services, 24 F.C.C.2d 318 (1970), 29 F.C.C.2d 870 (1971), Reconsideration denied, 31 F.C.C.2d 1106 (1971), Aff'd sub nom. Washington Utilities & Transp. Comm'n v. FCC, 513 F.2d 1142 (9 Cir.), Cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), numerous companies, including Graphnet and Telenet, have been authorized to furnish specialized domestic data services. International record service (including record service with Hawaii) has been furnished by only a few carriers. The market is dominated by RCA, ITT, and WUI, with several smaller companies, including TRT, French Cable Co., and U. S. Liberia Radio Corp., also participating. See generally Grad & Goldfarb, Government Regulation of International Telecommunications, 15 Colum. J. Transnat'l L. 384, 431 (1976). The IRC's have been thought to be prohibited by the proviso to § 222(a)(5) of the Act,[6] or by emanations from it, from engaging in domestic telegraph operations except by accepting and delivering messages at gateway cities approved by the FCC. At present there are only five such gateways, to wit, New York, Washington, D. C., San Francisco, Miami, and New Orleans. Since 1972 the Commission has been conducting petitioners say rather has not been conducting Docket No. 19660 in which the IRC's request approval of numerous additional gateways. Pursuant to what appears to have been deemed a statutory prohibition, see International Record Carriers, 38 F.C.C.2d 543, 548 (1972) (establishing Docket 19660), the Commission, while allowing IRC's to have domestic affiliates, has forbidden interconnection between them and the affiliated international operations pending the conclusion of Docket 19660. See, e. g., RCA Globcom Systems, Inc., 67 F.C.C.2d 1328, 1331-32 (1978); RCA Global Communications, Inc., 56 F.C.C.2d 660, 672 (1975); United States Transmission Systems, Inc., 48 F.C.C.2d 859, 862 (1974), Reconsideration denied, 51 F.C.C.2d 207, 209 (1975), Aff'd, American Tel. & Tel. Co. v. F. C. C., 176 U.S.App.D.C. 288, 539 F.2d 767 (1976). On the other side of the coin, this court has held that the Commission is prohibited from authorizing WU to engage in international mailgram service. Western Union International, Inc. v. FCC, 544 F.2d 87 (2 Cir. 1976), Cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977). In addition to its other objections, petitioner RCA sees in the decision under review a departure from the previously prevailing separation of domestic from international operations, made without adequate consideration or record support;[7] intervenor TRT claims the departure to have been illegal. We shall discuss these contentions in part V below.
 
 II.
 
 4
 Section 214(a) prohibits new common carrier communication "lines" in the absence of a certificate from the Commission that "the present or future public convenience and necessity require" it. Section 214(a) itself imposes no procedural requirements. However, the Commission has laid down quite elaborate specifications for the contents of an application under § 214, 47 C.F.R. § 63.01 et seq., and has provided that any interested party may file an application to deny it, Id. § 63.52(c). The applicant may then file an opposition and the opposer a reply. Allegations of fact not subject to official notice must be supported by affidavit. The lack of a hearing requirement in § 214(a)[8] contrasts sharply with § 309(e), which provides that, upon an application being made for a construction permit or station license, the Commission shall hold a hearing if "a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding" of "public interest, convenience and necessity" specified in § 309(a).[9]
 
 
 5
 Neither is an evidentiary hearing on a § 214(a) application required by the Administrative Procedure Act. Although licensing constitutes "adjudication", 5 U.S.C. § 551(6) and (7), this does not make an application under § 214 subject to an evidentiary hearing since 5 U.S.C. § 554 applies only to "every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing", and § 556, so far as it deals with adjudications, applies only when a hearing is required by § 554.
 
 
 6
 This analysis has two consequences. The first is that the post-decision requests of TRT and WUI for an evidentiary hearing were addressed to the Commission's discretion. The second is that the standard for our review under 5 U.S.C. § 706 is not the substantial evidence test of § 706(2)(E) but that of § 706(2)(A) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[10] See Automobile Club of New York, Inc. v. Cox, 592 F.2d 658, 664 (2 Cir. 1979).
 
 
 7
 Vague as the standard of § 214 is, the Commission is not without guidance in its interpretation. The leading case is FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). The Court there held that the Commission could not authorize a competing international radiotelegraph service solely because of a national policy in favor of competition but "must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it." Id. at 97, 73 S.Ct. at 1005. It is not enough that "the Commission recites that competition may have beneficial effects" if it "does so in an abstract, sterile way." Id. at 94 & n. 6, 73 S.Ct. at 1004. On the other hand it is "not inadmissible for the Commission, when it makes manifest that in so doing it is conscientiously exercising the discretion given it by Congress, to reach a conclusion whereby authorizations would be granted wherever competition is reasonably feasible." It need not "make specific findings of tangible benefit" but must show "ground for reasonable expectation that competition may have some beneficial effect." Id. at 96-97, 73 S.Ct. at 1005. Applying the RCA case, the Court of Appeals for the District of Columbia Circuit reversed and remanded an authorization to provide competing private-line voice only telephone service between the United States Mainland and Hawaii on the ground that it was impermissible to authorize such service merely to equalize competition among competitors and that the FCC's statements on the benefits of competition were as "sterile" as in the RCA case. See Hawaiian Telephone Co. v. FCC, 162 U.S.App.D.C. 229, 234, 498 F.2d 771, 776 (1974).
 
 
 8
 Petitioners and intervenor TRT do not dispute that there is a growing market for the specialized services which Graphnet and Telenet proposed or that the service was not being provided when Graphnet and Telenet applied. They argue, however, that Graphnet and Telenet in fact were in no position to supply the service and that the Commission did not adequately consider the possibility of its being provided by the existing IRC's either by interconnection with domestic circuits or by the extension of their own facilities to interior points if the Commission has been wrong in construing 47 U.S.C. § 222 as prohibiting this.
 
 III.
 
 9
 The reason why Graphnet and Telenet were not able to furnish the direct service they proposed and have subsequently entered into interconnect agreements with IRC's[11] to do so is that the applicants had not and indeed have not yet made the necessary arrangements with the foreign communications agencies with which they must interconnect to provide international service. The claim is not simply that Graphnet and Telenet were not "fit, willing and able" to perform the services which they proposed, since § 214(a), unlike its counterparts in the Motor Carrier Act, 49 U.S.C. § 307, in Part III of the Interstate Commerce Act dealing with water carriers, 49 U.S.C. § 909(c), and in the Federal Aviation Act, 49 U.S.C. § 1371(d)(1), does not in terms require a finding to that effect, but that the Commission was unjustified in basing its award on the "new and innovative" character of Graphnet's and Telenet's proposals, 63 F.C.C.2d at 406-07, when in fact the IRC's would have been equally interested in providing these specialized services as soon as foreign communications administrations were ready to handle them. As RCA argues (Brief, p. 42), the IRC's were "victimized" by "their 'defeat' in a synthetic paper 'race' to file an application without regard to whether it could be implemented or not."
 
 
 10
 The Commission, Graphnet and Telenet answer, in effect, that this is the old problem of the chicken and the egg. The Commission thought that denial of Graphnet's and Telenet's applications for lack of the evidence of agreements with foreign governments usually required "might simply encourage foreign correspondents not to consider appropriate agreements for the overseas termination of Graphnet and Telenet services" presumably because of doubt whether the latter would in fact be able to render the service and believed that regulatory needs could be satisfied by requiring the execution and filing of satisfactory agreements prior to initiation of the services rather than prior to their authorization. 63 F.C.C.2d at 408.
 
 
 11
 The latter remark makes us wonder whether the Commission had grasped the IRC's objection. While the reservation proposed by the Commission might well suffice to protect against arrangements that would unduly increase the cost of the service or constitute a precedent prejudicial to other carriers, it did not speak to the point that Graphnet and Telenet had made only a paper proposal and did not deserve a reward on the score of innovation. Still we think it is not unreasonable for the Commission to grant applications for permits in order to assure the foreign correspondents that the applicants are competent to deal with them without further difficulty in obtaining United States authorization. Even under the possibly more restrictive standards of the Interstate Commerce Act, see General Telephone Co. of Southwest v. United States, 449 F.2d 846, 856 (5 Cir. 1971), there is no rule that existing carriers must be afforded an opportunity to improve their service before a certificate can be issued to an applicant proposing new or better service. United States v. Dixie Highway Express, Inc., 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967), see also Blue Bird Coach Lines, Inc. v. United States, 328 F.Supp. 1331, 1336-37 (W.D.N.Y.1971). While it is true that the IRC's could not have provided the improved service without the cooperation of foreign communications administrations, they have submitted nothing to show that they had specific plans to solicit such cooperation to offer facsimile or packet service until Graphnet's and Telenet's applications spurred them on.
 
 
 12
 While these considerations suffice to support the grant of temporary certificates to Graphnet and Telenet, they do not lead to the conclusion that the Commission was warranted in granting perpetual authorizations irrespective of how long the consummation of necessary agreements with foreign communications administrations may take. There comes a time when an authority unexercised because of inability becomes detrimental to the public interest, since it may discourage other carriers who have the ability from making the investment needed to perform a service, without any benefit to the public. In Cross-Sound Ferry Services, Inc. v. United States, 573 F.2d 725 (2 Cir. 1978), we reviewed an order of the Interstate Commerce Commission authorizing a competing ferry service where there were serious safety and accessibility problems at the termini. We approved the action of the ICC in granting a certificate limited to a three year term, at the end of which renewal could be considered. The ICC's brief in Cross-Sound cited several cases where it had imposed time limitations when the feasibility of a service was in doubt. American Delivery Systems, 346 I.C.C. 465 (1974); Watkins Motor Lines, 113 M.C.C. 658, Modified 114 M.C.C. 562 (1971); and Allied Delivery System, 120 M.C.C. 110 (1974). See also Texas-Oklahoma Exp., 110 M.C.C. 769, 784-85 (1969) (limit imposed because other carriers trying to provide same service had failed); Trans Western Exp., 118 M.C.C. 1, 12 (1973) (limit imposed to insure that applicant lived up to proposed performance). This was the course the FCC should have followed here; it was arbitrary and capricious to grant certificates unlimited in time when there was such serious doubt whether they could be implemented. Moreover, as will be seen, imposition of such a limit was required on other grounds as well.
 
 IV.
 
 13
 The petitioners' argument that the service proposed by Graphnet and Telenet could also be provided by the IRC's via interconnection faces the initial difficulty that even if the proposition were established, it would not warrant our reversing the Commission. In addition to the cases cited in Part III, it is worth noting the statement in Washington Utilities & Transp. Comm'n v. FCC, supra, 513 F.2d at 1157, that the "statutory language does not suggest that the Commission is to give controlling weight to the mere fact that existing common carriers have the ability to perform the service an applicant wishes to furnish." See also Pocket Phone Broadcast Service v. FCC, 176 U.S.App.D.C. 99, 103-104, 538 F.2d 447, 451-52 (1976). Petitioners' argument must be rather that the Commission did not adequately Consider the possibility of affording the service by interconnection and articulate the reasons why it would be preferable to authorize Graphnet and Telenet to provide a through service, and this at the cost of disrupting the historic separation of domestic and international record communications. See Part V Infra.
 
 
 14
 It must be conceded that the FCC's findings on this point are exceedingly meagre. The Commission says in P 5 of its opinion, 63 F.C.C.2d at 405 that:
 
 
 15
 The services presently offered by the international record carriers do not have the inherent capability to provide data transmission services for a substantial number of potential users in a cost effective manner.
 
 
 16
 However, this does deal with the contention that the IRC's could expand their services when foreign communications administrations were ready to join, until which time, as developed above, Graphnet and Telenet were equally without capability to render the service which they proposed. In P 7, 63 F.C.C.2d at 406, the Commission elaborates on the need for "more and better service" but acknowledges that "(i)t remains to be determined how this service can best be provided." It then summarizes the four proposals before it, none involving interconnection. After characterizing Graphnet and Telenet as "authorized common carriers with proven capability and expertise in the provision of sophisticated domestic data communications services", 63 F.C.C.2d at 407, and saying that grant of their applications "would extend the benefits of their capability and expertise into the competitive international environment and make available to the public the benefits inherent in their respective service offerings," Id., the Commission launches into a statement of its intentions to subject the new authorization "to specific reporting requirements so that the Commission can evaluate information gained from actual operating experience and keep itself informed as to the exact dimensions of the public need and how it can be best fulfilled." Id. While the decision denying RCA's petition for reconsideration, 67 F.C.C.2d at 1030-32, PP 33-37, contains a more elaborate description of the proposed services, it also says nothing specific about interconnection.
 
 
 17
 The FCC urges on brief that the absence of any discussion of this subject was due to the fact that the issue was never raised. Our examination of the record shows that the issue was raised by WUI and, to a lesser extent, by RCA, with respect to Telenet.[12] Indeed, WUI argued that interconnection was not only equal but superior to Telenet's proposal. However, the point seems to have become lost in the shuffle of arguments proffered by the IRC's including many that are no longer pressed. Considering the Commission's opinion as a whole, we think that its expressions as to the desirability of projecting Graphnet and Telenet abroad was a sufficient answer to such argument on the score of interconnection as was made, although barely so.
 
 V.
 
 18
 The IRC's strongly pressed before the Commission the point that it was unfair to allow Graphnet and Telenet to operate from all points in the United States whereas they were confined to the five gateways, at least until, in the fullness of time, Docket No. 19660 might provide more. In P 15 of its opinion, the FCC characterized RCA's position with respect to competitive disadvantage as deriving "from the fact that RCA, as an international telegraph carrier, is restricted by Section 222 of the Act from domestic telegraph operations other than accepting or delivering international telegraph messages in designated gateway cities; whereas Graphnet and Telenet, which are not international telegraph carriers as defined in Section 222, are not similarly restricted." 63 F.C.C.2d at 408-09. After developing why this disadvantage would not be so serious as the IRC's contended, the Commission went on to "note that any possible competitive disadvantage which might accrue to the international telegraph carriers in this situation derives not from our actions authorizing Graphnet and Telenet to extend their service offerings, but from restrictions which Congress imposed on the international telegraph carriers. We cannot refuse to authorize services which would clearly benefit the public merely because a potential competitor might arguably be restricted in the nature of his competitive response by provisions of the Act which Congress, in its judgment, has seen fit to impose on certain entities." 63 F.C.C.2d at 409. It also refused to require Graphnet and Telenet to set up separate corporations for their domestic and overseas service, as it had done in the case of the IRC's. RCA Global Communications, Inc., supra, 56 F.C.C.2d 660. See also RCA Globcom Systems, Inc., supra, 67 F.C.C.2d 1328; ITT, Domestic Transmission Systems, supra, 62 F.C.C.2d 236.
 
 
 19
 In their briefs in this court RCA and ITT argue that the restriction on their serving points in the United States other than designated gateways is not compelled by the Act but results from Commission policy. Because of this, they say, it was error for the Commission to find public convenience and necessity in the ability of Graphnet and Telenet to provide direct service from and to nongateway points since all that was needed was for the Commission to modify its policy of forbidding the IRC's to serve points other than gateways. Alternatively, ITT argues that the Commission should have viewed the case as matters would stand if a large number of additional gateways were to be designed in Docket No. 19660.[13] In contrast, TRT argues for the first time here that, just as international telegraph carriers are restricted from domestic operations except in gateways (in its view by statute and not simply by FCC policy), domestic telegraph carriers are wholly prohibited from international operations. In answering RCA and ITT, counsel for the Commission say that "the Commission's discussion of Section 222 was pure dictum" (Brief, p. 30 n. 22) and rely on the Commission's findings of lack of significant prejudice. They object to our considering TRT's argument since it was not presented to the Commission and alternatively contend it to be without merit. In reply briefs, RCA repeats that the Commission's action was "flawed by a misperception" of § 222 of the Communications Act (pp. 13-21), and ITT insists that the characterization of the Commission's references to § 222 as dictum requires a remand "if for no other reason than to permit the FCC to provide the Court with a fuller and more definitive statement of the Commission's interpretation of Section 222 and its significance to this proceeding." (p. 11 n.**). TRT urges us to consider its argument and to uphold it.
 
 
 20
 Although we have concluded that these petitions to review are not the appropriate vehicle for attempting definitive construction of § 222, it is necessary to open up the problem. We observe preliminarily that although obscurity in federal statutes is not a new phenomenon to this court, we have rarely seen opacity quite as dense as here. This is remarkable since the issue is not one understandably overlooked by Congress but rather one lying near the very heart of what that body had been debating for some years. The best solution, at least from the standpoint of the courts, would be for Congress to clear away the debris it created thirty-five years ago and clearly advise what it wants. Legislation to that end was introduced into the last Congress, see H.R. 13015, 95th Cong., 2d Sess. (1978), but was not reported out of committee. We understand that bills importantly affecting the structure of the industry have been introduced in the 96th Congress.
 
 
 21
 Section 222, entitled "Consolidations and Mergers of Telegraph Carriers", was added to the Communications Act by the Act of March 6, 1943, 57 Stat. 5. Judge Anderson recounted much of the relevant background in his opinion for the majority of this court in Western Union International, Inc. v. FCC, supra, 544 F.2d at 89-91. Although Congress had been studying the larger problem of the future of the radiotelegraph industry, whose functioning had been considerably disrupted by national security considerations during World War II, the immediate concern of Congress was to permit the merger of the financially ailing Postal Telegraph Co., a domestic carrier, into Western Union Telegraph Co. (WU). Since this merger would have the effect of granting WU a De facto monopoly in "ordinary commercial messenger business within the United States", S.Rep.No.769, Committee on Interstate Commerce, Study of the Telegraph Industry, 77th Cong., 1st Sess. 20 (1941) (hereafter Telegraph Study), Congress feared that WU, which also had extensive international operations, would be able, unless legislation prevented, to divert unrouted international messages to its own service, thereby seriously damaging other international record carriers. The problem had to be considered against the background that prior to June, 1942,[14] RCA had served 12 and ITT's predecessor, Mackay Radio & Telegraph Co., had served 16 large cities within the United States. Although the domestic radiotelegraph industry "grew up through a desire of these companies, which are primarily in the international communications business, to establish their own pick-up and delivery service in the important centers where the bulk of the international business originates," it had developed, by 1942, into a substantial domestic business which amounted to approximately 15 percent of total revenue. Telegraph Study at 7.
 
 
 22
 Section 222(a), entitled "Definitions", supplies these for ten terms "(a)s used in this section." The important ones for our purposes are § 222(a)(2), (3), (5) and (6); we set these out in the margin.[15] Of particular importance is the proviso to § 222(a)(5).
 
 
 23
 Section 222(b) authorizes consolidation or merger of telegraph carriers as follows:
 
 
 24
 (1) It shall be lawful, upon application to and approval by the Commission as hereinafter provided, for any two or more domestic telegraph carriers to effect a consolidation or merger; and for any domestic telegraph carrier, as a part of any such consolidation or merger or thereafter, to acquire all or any part of the domestic telegraph properties, domestic telegraph facilities, or domestic telegraph operations of any carrier which is not primarily a telegraph carrier: Provided, That, except as provided in paragraph (2) of this subsection, no domestic telegraph carrier shall effect a consolidation or merger with any international telegraph carrier, and no international telegraph carrier shall effect a consolidation or merger with any domestic telegraph carrier.
 
 
 25
 (2) As a part of any such consolidation or merger, or thereafter upon application to and approval by the Commission as hereinafter provided, the consolidated or merged carrier may acquire all or any part of the domestic telegraph properties, domestic telegraph facilities, or domestic telegraph operations of any international telegraph carrier.
 
 
 26
 Passing over § 222(c)(1), which contains provisions for the Commission's passing upon proposed consolidations or mergers, we arrive at § 222(c)(2) which provides:
 
 
 27
 Any proposed consolidation or merger of domestic telegraph carriers shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger, within a reasonable time to be fixed by the Commission, after the consideration for the property to be divested is found by the Commission to be commensurate with its value, and as soon as the legal obligations, if any, of the carrier to be so divested will permit. The Commission shall require at the time of the approval of such consolidation or merger that any such party exercise due diligence in bringing about such divestment as promptly as it reasonably can.
 
 
 28
 Section 222(e) contains elaborate provisions designed to insure that "(i)n the case of any consolidation or merger of telegraph carriers pursuant to this section", the merged carrier will equitably distribute among the international telegraph carriers telegraph traffic by wire or radio without the continental United States.
 
 
 29
 On a purely literal reading, § 222 does not speak at all with respect to applications under § 214 for service which the applicant is to perform itself, and the only operative provisions with respect to separation of domestic and international operations are the proviso to § 222(b)(1), Supra, that except as therein provided no domestic telegraph carrier shall consolidate or merge with an international telegraph carrier, and the requirement of § 222(c)(2), Supra, that any consolidation or merger of domestic telegraph carriers shall provide for the divestment of international telegraph operations theretofore carried on by any party to the consolidation or merger. On this literal approach, the proviso to § 222(a)(5) would be read as merely definitional, as the statute says it should be. In other words, for the purposes of applying the majority of the traffic and revenues tests of § 222(a)(2) and (3), international traffic accepted and delivered at the gateways, "and the incidental transmission or reception of the same over its own or leased lines or circuits within the continental United States", presumably to or from the cable or radio station, constitutes domestic and not international traffic. Also, and more important, the international telegraph operations that had to be divested under § 222(c) (2) could engage in the operations described in the gateway proviso.
 
 
 30
 However, it has now been established, so far as this circuit is concerned, that in one respect § 222 means more than it literally says. Drawing heavily on legislative history, a divided panel of this court held in Western Union International, Inc. v. FCC, supra, 544 F.2d at 93, that " § 222(c)(2)'s directive as to the divestment by the merged domestic carrier (WU) of 'international telegraph operations theretofore carried on by any party to the consolidation or merger' was meant as a continuing bar to WU's involvement in international record communications . . . ." However, this holding, from which one judge strongly dissented, 544 F.2d at 93-96, does not automatically lead to the conclusion that all of § 222 must be read into § 214. An important basis for the holding that WU was barred from applying under § 214 to engage in international operations was that "(t)his was the price paid by the company for the acquisition of a domestic monopoly over telegraph service." 544 F.2d at 93. Since the IRC's sought no such monopoly but remained in vigorous competition with each other, a still more extensive invocation of legislative history or deference to administrative interpretation would be required to justify a reading of this statute that would bar the IRC's from domestic telegraph operations outside the designated gateways as a matter of law.
 
 
 31
 The legislative history is both abundant and confusing.[16] For present purposes it suffices to say that in the last phase of congressional consideration, the House committee deleted the divestment clause and stated it was therefore omitting the § 222(a)(5) proviso "as unnecessary", H.R. Rep. No. 69, Committee on Interstate and Foreign Commerce, 78th Cong., 1st Sess. 6 (1943), but that both were restored by the Conference Committee, which explained its action as follows:
 
 
 32
 It was felt desirable to include this proviso, in order clearly to permit carriers to continue the operations referred to, because of the requirement (in subsection (c)(2)) that in case of a consolidation or merger of domestic telegraph companies the plan of consolidation or merger shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger. H. Rep. No. 142, Conference Report on S. 158, 78th Cong., 1st Sess. 10 (1943).
 
 
 33
 While this is rather Delphic, the Commission has long taken it as a mandate to prevent IRC's from originating or terminating international traffic at cities other than those designated by the Commission as gateways. Western Union Telegraph Co., 68 F.C.C.2d 98, 99 (1978) (rejecting in part proposed tariff filed by WU pertaining to interconnection of domestic record services with IRC's); RCA Globcom Systems, Inc., supra, 67 F.C.C.2d at 1331-32 (barring interconnection between IRC and domestic affiliate to avoid creation of unauthorized gateway); International Record Carriers, 58 F.C.C.2d 250, 254-57 (1976) (permitting each IRC to operate in all existing gateways); United States Transmission Systems, Inc., supra, 51 F.C.C.2d at 208-09 (barring interconnection between ITT and a domestic affiliate pending decision in Docket 19660); International Record Carriers, 40 F.C.C.2d 1082, 1084-85 (1973) (barring IRC's from providing free direct access from hinterland points to gateway facilities for international traffic); International Record Carriers, 38 F.C.C.2d 543, 548 (1972) (establishing general inquiry into designation of new gateways). See also RCA Alaska Communications, Inc., 22 F.C.C.2d 200, 202-03 (1970). Indeed, the major premise of Docket 19660 is that if IRC's are to be able to serve more points in the United States new gateways must be authorized, see generally International Record Carriers, 54 F.C.C.2d 532 (1975); and 58 F.C.C.2d 250 (1976).
 
 
 34
 Some of the Commission's opinions are fairly articulate on the interplay of §§ 222(a)(5) and 214; others take the exclusion of IRC's from receiving or delivering international traffic at non-gateway cities as a given. Most, as has been seen, are rather recent. While this deprives them of the special virtue attributed to administrative interpretation contemporaneous with enactment of the statute, Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933), it may also reflect a long-time industry acquiescence in the established structure. Perhaps it means only that until recent developments in communications technology no one cared overmuch.
 
 
 35
 It would not be appropriate for us to decide, on these petitions for review, a question of such moment as the applicability of the proviso in § 222(a)(5) to applications of IRC's under § 214 to serve non-gateway points. The persons who would be most adversely affected by an overturn or modification of the established interpretation, to wit, domestic telegraph carriers other than Graphnet and Telenet, had no reason to suppose that the issue was posed by the § 214(a) applications that were granted here. Doubtless believing that it would be an exercise in futility, the IRC's did not counter the applications of Graphnet and Telenet by seeking themselves to serve interior points. Instead they relied on the Commission's interpretation of the effect of the proviso defensively as showing that it would be unfair to grant Graphnet and Telenet rights to offer direct service between interior points and foreign countries that were denied to them. Questions as to the validity of this denial began to take on large proportions only when Commission counsel, in their brief in this court, declined the IRC's gambit and characterized the Commission's statement in regard to the statute as dictum. While we could remand for a full-dress exploration of the question, we are not persuaded that the decision to grant Graphnet's and Telenet's applications was so firmly grounded on their ability to perform a "through" service which the IRC's supposedly could not render as a matter of law, as to demand a reversal if we should conclude and we do not intimate that we would that the supposition was wrong; the decision was based rather on the desirability of acquiring experience in international data service by specialized carriers. In the language of the plurality opinion in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969), this is a case where "To remand would be an idle and useless formality." See also Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199.
 
 
 36
 Still this does not altogether dispose of petitioners' arguments. As previously indicated, the validity of the Commission's assumptions as to the effect of the § 222(a)(5) proviso can and should be considered in Docket No. 19660 and with reasonable speed. If it should there be decided that the proviso does not apply at all under § 214; that the proviso has only an analogical bearing on a § 214 application, cf. American Trucking Ass'ns v. United States, 355 U.S. 141, 149-52, 78 S.Ct. 165, 2 L.Ed.2d 158 (1957);[17] that IRC's whose international telegraph properties were not the product of the divestments incident to the WU-Postal merger are not affected by it; that it does not apply except to ordinary messenger service; or even that it does apply but a large number of added gateways are authorized for general or specialized services, the question of public convenience and necessity would have a far different aspect than when Graphnet's and Telenet's applications were granted. The aspect would be further changed if, by the time of that decision, some or all of the IRC's were able to provide the service, but Graphnet and Telenet still lacked the agreements with foreign communications administrations needed to that end. Other developments since this case was argued show how rapidly this industry is changing.[18] Yet, with all its emphasis on the experimental character of the grants made in this proceeding, the Commission, whether through oversight or otherwise, imposed no conditions that would enable it to terminate or even to modify Graphnet's and Telenet's authorizations if experience should indicate this to be desirable. Judge Leventhal's much quoted observation, American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633, Cert. denied, 358 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966), with respect to issues "where a month of experience will be worth a year of hearings," expressly assumed that the agency will be able "to make re-examinations and adjustments in the light of experience." Id. For this reason, in addition to that developed in Part III of this opinion, the authorizations to Graphnet and Telenet must be modified to allow the FCC to take whatever action it deems proper in the light of the outcome of Docket No. 19660 and of new developments in the industry.
 
 
 37
 We turn now to the contention of intervenor TRT that the Commission lacked power to grant the permits to Graphnet and Telenet. The argument is basically this: The proviso to § 222(a)(5) can have the effect of banning IRC's from domestic telegraph operations outside authorized gateways an effect supported, as TRT sees it, by legislative history and administrative interpretation only if what are stated as definitional provisions are given operative effect. Hence just as the IRC's are barred from domestic telegraph operations except as allowed in the gateways under the proviso, domestic carriers are barred from international telegraph operations altogether. This is because § 222(a)(6), defining "international telegraph operations", has no proviso corresponding to that in § 222(a)(5) which might reserve for domestic carriers a place in the international market.
 
 
 38
 We could dispose of this on the basis of TRT's failure to raise the objection before the Commission. Although the Communications Act does not contain the provision, common in regulatory statutes, E. g., National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e), that no objection not urged before the agency "shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances", a similar objective has been deemed to have been achieved by the provision in § 405:
 
 
 39
 The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass.
 
 
 40
 See Gross v. FCC, 480 F.2d 1288, 1290-91 n. 5 (2 Cir. 1973), and cases there cited. This has been held to be so even with respect to a question of the agency's power, Presque Isle TV Co. v. United States, 387 F.2d 502, 504-06 (1 Cir. 1967). Our decision in New York State Broadcasters Ass'n v. United States, 414 F.2d 990, 994 (2 Cir. 1969), is not to the contrary, for reasons there explained. However, we think it is as well to remove the argument from the scene. We find nothing in the language of the statute, in the legislative history or in the administrative interpretation to support the view that domestic telegraph operators not bearing the special curse of WU are barred as a matter of law from being authorized under § 214 to render international service, as distinguished from merging with an international carrier under § 222. The only basis for construing the proviso to § 222(a)(5) as limiting IRC's to gateways as a matter of law rather than of policy if indeed it be a sufficient one is that this was the quid pro quo payable by them to WU-Postal in return for the requirement that WU and Postal divest themselves of international operations as a condition to their merger. Until TRT submitted its brief on these petitions to review, no one seems ever to have thought that Congress intended to bar a domestic telegraph operator not merged under § 222 from applying under § 214 to render international service. We are reminded of Mr. Justice Frankfurter's remark that "the presumption is powerful" that such a novel construction as TRT urges was not previously uncovered "because it is not there." Romero v. International Terminal Operating Co., 358 U.S. 354, 370-71, 79 S.Ct. 468, 479, 3 L.Ed. 368 (1959). The most that can be said for TRT's argument is that in proceedings under § 214, the policies with respect to mergers expressed in § 222(b) and (c) should be taken into account as was said in a somewhat similar context under the Interstate Commerce Act, "as a guiding light, not as a rigid limitation." American Trucking Ass'ns v. United States, supra, 355 U.S. at 149-52, 78 S.Ct. at 170.
 
 
 41
 We therefore direct the Commission to modify the permits issued to Graphnet and Telenet by inserting a time limit that will allow them to be terminated or altered as may be appropriate in light of Docket No. 19660, the continued inability of Graphnet or Telenet to make necessary arrangements with foreign correspondents, and recent developments in the industry. We also suggest that the proceedings in Docket No. 19660 be expedited. No costs.
 
 
 
 [1]
 The term "record" is in contradistinction to voice carriers
 
 
 [2]
 Graphnet's system is claimed to have the important advantage of permitting transmission "to facsimile devices . . . in other nations whether or not the facsimile devices are compatible with the subscriber's input device." 63 F.C.C.2d at 406
 
 
 [3]
 The advantage of Telenet's service is in the more efficient use of circuits. Computers in over 80 cities throughout the continental United States receive traffic from leased and dialed telephone lines, break down each message into "packets" having up to 128 characters, and separately address and route each packet over the most expeditious path available at that particular moment to the destination Telenet office, where the packets are reassembled into the complete message and delivered to the customer's computer or terminal. (Brief, p. 3 n. 1)
 
 
 [4]
 The Commission refused to entertain what it deemed belated requests of TRT and WUI for an evidentiary hearing. See 67 F.C.C.2d at 403 n. 1; Memorandum Op'n and Order, released April 20, 1977, File No. I-T-C-2658
 
 
 [5]
 Since oral argument was heard in the present case, the FCC has ended WU's monopoly over the domestic telegraph business. See --- F.C.C.2d --- (1979)
 
 
 [6]
 See note 15 Infra
 
 
 [7]
 Petitioner ITT seems to take a more limited approach; it does not insist on preservation of the separation if its equal competitive position is preserved
 
 
 [8]
 The Court of Appeals for the District of Columbia Circuit has twice intimated in dictum that § 214(a), does carry with it some "hearing" requirement. See United Telegraph Workers v. F. C. C., 141 U.S.App.D.C. 190, 194, 436 F.2d 920, 924 (1970); Hawaiian Telephone Co. v. F. C. C., 191 U.S.App.D.C. 124, 131 n. 13, 589 F.2d 647, 654 n. 13 (1978). In the United Telegraph Workers case, the source of this requirement was not identified. In the Hawaiian Telephone case, the court seemed to believe that the hearing requirement of § 214(d), ostensibly relating only to situations in which the Commission orders a carrier to provide facilities, see Specialized Common Carrier Services, supra, 29 F.C.C.2d at 897, applies as well in § 214(a) applications. Our own reading of the statute reveals no requirement for a formal hearing on § 214(a) applications
 
 
 [9]
 In some cases the provisions of Title II of the Act (§§ 201-23) governing "common carriers" overlap with those of Title III (§§ 301-30), which contains special provisions relating to radio. Common carriers by radio may be regulated under both titles. See National Ass'n of Regulatory Utility Comm'rs v. F. C. C., 173 U.S.App.D.C. 413, 427, 525 F.2d 630, 644, Cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976) (dictum). This is the case with applications relating to the construction of earth stations for use in connection with satellite communications systems. See Hawaiian Telephone Co. v. F. C. C., supra, at 128 n. 2 of 191 U.S.App.D.C. and at 651 n. 2 of 589 F.2d. In the present case, involving "value added" carriers, which merely lease lines and enhance their potentialities by special technology, the provisions of Title III do not appear to be implicated. See Packet Communications, Inc., 43 F.C.C.2d 922, 925 (1973); Telenet Communications Corp., 46 F.C.C.2d 680 (1974); Graphnet Systems, Inc., 44 F.C.C.2d 800 (1974)
 
 
 [10]
 As to how meaningful the difference of standards may be, see Associated Industries of New York State, Inc. v. U. S. Department of Labor, 487 F.2d 342, 349-50 (2 Cir. 1973). But see Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)
 
 
 [11]
 At least Telenet has done this; the record with respect to Graphnet is unclear
 
 
 [12]
 RCA suggests that any failure on the part of the IRC's to make the point in regard to interconnection more strongly before the Commission was due to the fact that at that time they had no capability to offer such service, since they lacked operating agreements with foreign governments. Graphnet and Telenet, of course, suffered then from the same lack of capability and still do
 
 
 [13]
 At times ITT seems to be asking us to direct the Commission to designate additional gateways, which is manifestly beyond our power, or to condition the grants to Graphnet or Telenet on such designation
 
 
 [14]
 The services were ordered to be shut down on that date for security reasons by the Board of War Communications, 7 Fed.Reg. 4183, 5089 (1942)
 
 
 [15]
 (2) The term "domestic telegraph carrier" means any common carrier by wire or radio, the major portion of whose traffic and revenues is derived from domestic telegraph operations; and such term includes a corporation owning or controlling any such common carrier
 (3) The term "international telegraph carrier" means any common carrier by wire or radio, the major portion of whose traffic and revenues is derived from international telegraph operations; and such term includes a corporation owning or controlling any such common carrier.
 (5) The term "domestic telegraph operations" includes acceptance, transmission, reception, and delivery of record communications by wire or radio which either originate or terminate at points within the continental United States, Alaska, Canada, Saint Pierre-Miquelon, Mexico, or Newfoundland, and terminate or originate at points within the continental United States, Alaska, Canada, Saint Pierre-Miquelon, Mexico, or Newfoundland, and includes acceptance, transmission, reception, or delivery performed within the continental United States between points of origin within and points of exit from, and between points of entry into and points of destination within, the continental United States with respect to record communications by wire or radio which either originate or terminate outside the continental United States, Alaska, Canada, Saint Pierre-Miquelon, Mexico, and Newfoundland, and also includes the transmission within the continental United States of messages which both originate and terminate outside but transit through the continental United States: Provided, That nothing in this section shall prevent international telegraph carriers from accepting and delivering international telegraph messages in the cities which constitute gateways approved by the Commission as points of entrance into or exit from the continental United States, under regulations prescribed by the Commission, and the incidental transmission or reception of the same over its own or leased lines or circuits within the continental United States.
 (6) The term "international telegraph operations" includes acceptance, transmission, reception, and delivery of record communications by wire or radio which either originate or terminate at points outside the continental United States, Alaska, Canada, Saint Pierre-Miquelon, Mexico, and Newfoundland, but does not include acceptance, transmission, reception, and delivery performed within the continental United States between points of origin within and points of exit from, and between points of entry into, and points of destination within, the continental United States with respect to such communications, or the transmission within the continental United States of messages which both originate and terminate outside but transit through the continental United States.
 
 
 [16]
 The confusion is due both to the fact, noted above, that Congress was studying the entire structure of the cable and radiotelegraph industry, see H. Rep. No. 69, 78th Cong., 1st Sess. 4 (1943), as well as the special problem of the Western Union-Postal merger and to failure to distinguish the functions of carrying international traffic from and to "hinterland" points and actual domestic operations between such points
 
 
 [17]
 The question in that case was whether the proviso in § 5(2)(b) of the Interstate Commerce Act prohibiting the ICC from approving a railroad's acquisition of a motor carrier unless this would enable the rail carrier to use service by motor vehicle in its operations applied to a certificate application by a rail-owned motor carrier. The Court held that the proviso did not apply as such to certificate applications but that, in passing on such applications, the ICC should give appropriate weight to the policy stated in the acquisition section
 
 
 [18]
 By a decision dated January 25, 1979, see note 5, Supra, the Commission authorized other companies, including Graphnet, to compete with WU in the domestic telegraph business, and authorized Graphnet to deliver petitioners' international messages within the United States. Beyond this we learn from the press that General Telephone & Electronics Corp. has agreed in principle to acquire Telenet for common shares currently valued at some $59 million, Wall Street Journal, Dec. 12, 1978, and that Xerox Corp. has agreed, subject to FCC approval, to acquire WUI for about $205 million in stock. N.Y. Times, Jan. 19, 1979